EXHIBIT 8

LUSKIN, STERN & EISLER LLP             OPPENHEIM + ZEBRAK, LLP
Michael Luskin                         Matthew J. Oppenheim
Stephan E. Hornung                     Lucy Grace D. Noyola (*pro hac vice motion
50 Main Street                         forthcoming*)
White Plains, New York 10606           4350 Wisconsin Avenue, NW, Fifth Floor
(212) 597-8200                         Washington, DC 20016
                                       (202) 480-2999

*Counsel for the Universal Claimants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
In re                                :       Chapter 11
                                     :
FRONTIER COMMUNICATIONS              :       Case No. 20-22476 (RDD)
CORPORATION, *et al.*,[1]            :
                                     :       (Jointly Administered)
                          Debtor.    :
------------------------------------------------------------ x


**RESPONSE OF THE UNIVERSAL CLAIMANTS TO THE OMNIBUS OBJECTION TO
CERTAIN DISPUTED COPYRIGHT CLAIMS**

---

[1] The last four digits of Debtor Frontier Communications Corporation's tax identification number are 9596. Due to the large number of debtor entities in these chapter 11 cases, for which the Court has ordered joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/ftr. The location of the Debtors' service address for purposes of these chapter 11 cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

Claimants UMG Recordings, Inc. and Capitol Records, LLC (together, the "<u>Universal Claimants</u>"), by and through their undersigned counsel, submit this Response to the Reorganized Debtors' Omnibus Objection to Certain Disputed Copyright Claims ("<u>Response</u>"), and in support thereof, respectfully state as follows:

## PRELIMINARY STATEMENT

The Universal Claimants filed an unsecured pre-petition proof of claim against Frontier Communications Corporation ("<u>Frontier</u>," together with its debtor affiliates, the "<u>Debtors</u>" or the "<u>Reorganized Debtors</u>"), asserting claims that Frontier is contributorily and vicariously liable for violations of federal copyright law by Frontier's subscribers before Frontier filed for bankruptcy (the "<u>Universal Pre-Petition Claim</u>").[2]  The Universal Claimants seek relief for copyright claims that accrued between May 2, 2019 and March 10, 2020 for infringement of at least 1,652 of the Universal Claimants' copyrighted sound recordings.

Frontier's laim objection is a kitchen-sink approach to contesting the Universal Pre-Petition Claim without regard to the underlying facts and the controlling law.  As set forth below, Frontier's substantive objections are without merit.

Having reneged on an agreed-upon information exchange to potentially resolve the dispute, Frontier now proposes an unreasonable schedule for adjudicating the Universal Pre-Petition Claim, along with other pre-petition claims involving substantially similar copyright claims.  That schedule—which contemplates the completion of both fact and expert discovery in less than five months and an evidentiary hearing just ten days after discovery concludes—is highly impractical given the nature of the claims, the number of copyrighted works at issue, and the complexity and nuances of the copyright law issues involved.  This is not the type of matter

---

[2] A copy of the Universal Pre-Petition Claim [Claim No. 3560] is attached as **Exhibit 1**.

where discovery can be hastily completed in a few months.  Cases like this typically involve substantial discovery, including deposition testimony of numerous party and third-party witnesses, and extensive expert analyses and testimony.  As explained below, Frontier refused to produce a limited set of documents through informal discovery over the course of *two* months. Accordingly, the Universal Claimants have no confidence that Frontier will be able to provide complete discovery, including documents and depositions, both fact and expert, within its highly-compressed timeline of *five* months.

Moreover, the proposed schedule does not account for the administrative claims (as defined below, the "Administrative Claims") filed by the Universal Claimants and other record companies with copyright claims against Frontier (as defined below, the "Copyright Claimants"). Although the Debtors have not yet objected to the Administrative Claims filed by the Copyright Claimants, the Debtors undoubtedly will do so before the July 31, 2021 deadline to object to Administrative Claims.  Additionally, on June 8, 2021, the Copyright Claimants commenced an action against Frontier in the United States District Court for the Southern District of New York asserting claims arising out of the Frontier's infringing activity that has continued since the Debtors emerged from bankruptcy.

Contemporaneously with the filing of this Response, the Copyright Claimants have moved to withdraw the reference with respect to adjudication and allowance of the Universal Pre-Petition Claim and the Administrative Claims.  The pre- and post-petition and post-Effective Date claims should all be adjudicated together because they are virtually identical, involving the same types of claims and theories of liability.

Discovery should proceed in a coordinated manner before the District Court.  However, to the extent discovery proceeds before the Bankruptcy Court, any schedule must account for

resolution of the Administrative Claims and decision on the Copyright Claimants' motion to withdraw the reference, contemporaneously filed herewith, and provide sufficient time for discovery that is commensurate with the magnitude and complexity of the copyright claims.

## BACKGROUND

### A.  The Universal Claimants

The Universal Claimants are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, both in the United States and internationally.  Through their enormous investments of money, time, and exceptional creative efforts, the Universal Claimants and their recording artists have created, produced, developed, marketed, and distributed musical works performed by some of the world's most famous and popular artists. They own or control in whole or in part the copyrights or exclusive rights in innumerable sound recordings.  (Universal Pre-Petition Proof of Claim ¶ 1.)

### B.  Frontier's Infringing Behavior

Frontier is one of the largest Internet service providers ("ISPs") in the United States and markets, promotes, and sells high-speed Internet access to customers across the country.  While Frontier offers a variety of different products, its Internet service is the crown jewel of its product offerings, accounting for a significant portion of the company's revenues.  (*Id.* ¶ 2.)

Frontier's customers pay Frontier substantial subscription fees for access to and use of its high-speed Internet network, with Frontier offering a tiered pricing structure based on the speed of service.  (*Id.*)  Frontier charges more for customers who require high bandwidth.  (*Id.*) Among those that Frontier knows need higher bandwidth are users who use BitTorrent and other

peer-to-peer ("P2P") networks to upload and download copyrighted files illegally.[3]  In fact, Frontier markets its high-speed service as enabling subscribers to "[d]ownload 10 songs in 3.5 seconds."  (*Id.* ¶¶ 2, 12.)

Frontier's terms of service strictly prohibit subscribers from using the network to infringe.  Under Frontier's "Acceptable Use Policy," to which its subscribers must agree as a condition of using its Internet services, Frontier has the right to suspend or terminate a subscriber's Internet access for a variety of reasons, including a subscriber's use of Frontier's network or services for "transmitting or receiving copyright infringing . . . material."  (*Id.* ¶ 19, Ex. C, at 1.)  Frontier's Acceptable Use Policy also provides that "[r]epeated copyright infringements are grounds for termination of service."  (*Id.*)

However, at all pertinent times, Frontier did not enforce its non-infringement policy and allowed infringement to occur on its network largely unabated.  (Universal Pre-Petition Proof of Claim ¶ 20.)  Frontier has received hundreds of thousands of infringement notices from copyright owners, in addition to the Universal Claimants, that detail ongoing massive infringement occurring on its network.  (*Id.* ¶¶ 4, 17, 20.)  While Frontier claims to have had a policy in place to address infringement, Frontier designed—and implemented—its policy to have virtually no impact.  Frontier had actual knowledge that many subscribers on its network had been the subject of dozens, and even hundreds, of infringement notices.  (*Id.* ¶¶ 5, 15–18, 25.)

---

[3] P2P is a term used to refer to a decentralized network of users whereby each Internet-connected participant (i.e., a "peer" or a "node") can act as both a supplier and consumer of content files.  Early P2P services, such a Napster and KaZaA, have been replaced by even more robust and efficient systems, most notably a protocol called "BitTorrent." The online piracy committed via BitTorrent is stunning in nature, speed, and scope.  Utilizing a BitTorrent client—essentially a tool that manages the uploading and downloading of files through BitTorrent technology—persons connected to the Internet can locate, access, and download copyrighted content from other peers in the blink of an eye.  They download copyrighted music from other network users, usually total strangers, and end up with complete digital copies of any music they desire—including entire catalogues of music—without payment to copyright owners or creators.  *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 918–23 (2005); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 963–64 (E.D. Va. 2016), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293, 307–12 (4th Cir. 2018).

Rather than address its subscribers' blatant infringement, Frontier continued to provide service to these infringing subscribers so that Frontier could continue to collect top-tier, monthly subscriber fees charged to its most lucrative subscribers.  (*Id.* ¶ 20–21.)

### C.   Procedural History

On April 14, 2020 (the "Petition Date"), Frontier and certain affiliated entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

On August 27, 2020, the Bankruptcy Court confirmed the Debtors' Chapter 11 plan of reorganization (the "Plan") and entered *Findings of Fact, Conclusions of Law, and Order Confirming the Fifth Amended Joint Plan of Reorganization of Frontier Communications Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*. [ECF No. 1005.]

On April 30, 2021, the Debtors filed a *Notice of (I) Entry of Confirmation Order, (II) Occurrence of Effective Date, and (III) Related Bar Dates* [ECF No. 1793], which provided notice of the effective date of the Plan, which had occurred on April 30, 2021 (the "Effective Date"), and of the June 1, 2021 bar date for administrative proofs of claim.

### 1.   The Universal Claimants' Pre-Petition Claim

On January 22, 2021, the Universal Claimants filed an unsecured proof of claim against Frontier.  The Universal Pre-Petition Claim asserts that Frontier is contributorily and vicariously liable for thousands of direct infringements by Frontier's subscribers of at least 1,652 of the Universal Claimants' copyrighted sound recordings prior to the Petition Date.  The Universal Claimants seek unliquidated damages, plus attorneys' fees and full costs.  In the Universal Pre-Petition Proof of Claim, the Universal Claimants expressly reserved the right to:  (i) file a motion

to withdraw the reference; (ii) object to the Bankruptcy Court's entry of a final order or judgment; and (iii) request a jury trial on their claims.  (Universal Pre-Petition Proof of Claim, at 7.)

On May 17, 2021, the Reorganized Debtors filed an *Omnibus Objection to Certain Disputed Copyright Claims* (the "Claim Objection") [ECF No. 1818], which included the Universal Pre-Petition Claim.

### 2.       The Administrative Claims

Frontier's infringing conduct continued after the Debtors filed for bankruptcy.  On June 1, 2021, the Universal Claimants, along with other copyright owners (collectively, "Copyright Claimants"), each filed an administrative proof of claim (collectively, the "Administrative Claims," and together with the Universal Pre-Petition Claim, the "Proofs of Claim") pursuant to section 507(a)(2) and 503(b) of the Bankruptcy Code under compulsion of the Administrative Claims Bar Date set forth in the Plan.[4]  Similar to the Universal Pre-Petition Claim, the Administrative Claims assert that Frontier is contributorily and vicariously liable for thousands of direct infringements by Frontier's subscribers of at least 6,025 of the Copyright Claimants' copyrighted sound recordings that accrued between the Petition Date and the Effective Date of the Plan.  The Administrative Claims seek damages in an unliquidated amount, plus attorneys' fees and full costs.

In the Administrative Claims and in a subsequent reservation of rights filed on the docket, each of the Copyright Claimants expressly reserved the right to: (i) file a motion to withdraw the reference; (ii) object to the Bankruptcy Court's entry of a final order or judgment; and (iii) request a jury trial on their claims.  [*See* ECF Nos. 1887–1889.]

---

[4] Copies of the Administrative Claims are attached as **Exhibits 2–4**.

The Debtors have not objected to the Administrative Claims yet. However, the Debtors undoubtedly will do so by the July 31, 2021 Claims Objection Deadline for Administrative Claims. (*See* Plan Art. I.A.47.)

### D.   The Pending District Court Action

Frontier's failure to take action against repeat copyright infringers has continued since the Debtors emerged from bankruptcy on April 30, 2021. On June 8, 2021, certain of the Copyright Claimants commenced an action (the "District Court Action") against Frontier seeking (i) damages for Frontier's infringement of those Copyright Claimants' copyrighted sound recordings since the Effective Date (the "Post-Effective Date Copyright Claims"); and (ii) a preliminary and permanent injunction against Frontier and the other Reorganized Debtors.[5] The District Court Action is pending under the caption *UMG Recordings, Inc. v. Frontier Communications Corporation*, Case No. 1:21-cv-05050 and has been assigned to Judge Analisa Torres. The Bankruptcy Court does not have jurisdiction to determine the Post-Effective Date Copyright Claims, which are not related to the Bankruptcy Code, the administration of the Frontier bankruptcy estate, or its now-effective Plan. The District Court Action involves the same conduct, types of claims, and defenses that must be adjudicated in connection with the Universal Pre-Petition Claim and Administrative Claims.

### E.   The Parties' Informal Discovery

In March 2021, counsel for the Universal Claimants and Frontier met and conferred by telephone to discuss the Universal Pre-Petition Claim. Frontier asserted that it was entitled to the safe harbor under the Digital Millennium Copyright Act ("DMCA"). Over the course of that conference, email exchanges, and a subsequent conference, the parties agreed to engage in

---

[5] A copy of the complaint filed in the District Court Action is attached as **Exhibit 5**.

informal discovery limited to the threshold issue of Frontier's eligibility for the safe harbor under

the DMCA and to produce documents according to an agreed-upon schedule.  Frontier agreed at

the outset to produce, for a three-year period, its policies on copyright infringement,

infringement notice data, and summary information regarding its subscriber suspensions and

terminations for copyright infringement.

To this date, Frontier has not produced the documents it agreed to produce.  The

Universal Claimants have pressed Frontier to explain the gaps in its production but have received

no meaningful response.

On the other hand, the Universal Claimants produced all documents they agreed to

produce, which included detailed data relating to every infringement notice that had been sent to

Frontier related to the pre-petition claim, as well as examples of the evidence packages

supporting each of those notices.[6]  Each evidence package contains a group of log files showing

the contemporaneous evidence collected of infringement by Frontier subscribers.

### F.     The Motion to Withdraw the Reference

Contemporaneously with the filing of this Response, the Copyright Claimants moved to

withdraw the reference with respect to adjudication and allowance of the Proofs of Claim

(the "Withdrawal Motion").  [ECF Nos. 1898–1900.]  As discussed more fully in the Withdrawal

Motion, withdrawal of the reference with respect to adjudication of the Copyright Claimants' is

mandatory because those claims arise under, and present complex issues of, federal non-

bankruptcy law, namely the Copyright Act of 1976 (the "Copyright Act"), the DMCA, and the

---

[6] When the parties agreed to engage in informal discovery, the Universal Claimants objected to several of Frontier's requests because, among other reasons, the requests did not seek information related to the applicability of the DMCA safe harbor.  During the meet-and-confer, the parties agreed on what the Universal Claimants would produce.  Contrary to Frontier's assertions, the Universal Claimants fully completed their informal discovery obligations.

Classics Protection and Access Act (the "Classics Act"), 17 U.S.C. § 1401.  To adjudicate all of the claims at issue—the Universal Pre-Petition Claim, the Administrative Claims, and the Post-Effective Date Copyright Claims—the trier of fact and law will be required to give substantial and material consideration of the DMCA and to understand and interpret terms of art unique to federal copyright law rather than simply apply well-defined principles of established law.

In the alternative, permissive withdrawal of the reference is appropriate because, on balance, the "*Orion* Factors" favor withdrawal:[7]  (i) adjudication of the federal copyright claims will require complex litigation of novel issues (some of first impression in this Circuit) of federal copyright law; (ii) allowing separate actions in the Bankruptcy Court and the District Court to proceed will waste judicial resources and could result in inconsistent judgments; (iii) removal will have no effect on the uniform administration of bankruptcy law; and (iv) the Copyright Claimants are not forum shopping.

Moreover, withdrawal of the reference to the District Court is consistent with the Debtors' 100% plan of reorganization, which expressly contemplates that matters related to the Debtors' bankruptcy proceedings may be withdrawn to the District Court under 28 U.S.C. § 157(d) and that claims will be adjudicated by tribunals other than the Bankruptcy Court.

The Bankruptcy Court lacks jurisdiction to adjudicate the Post-Effective Date Copyright Claims asserted in the District Court Action; those claims must proceed to a jury trial before the District Court.

---

[7] In *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993), the Second Circuit identified several factors that a District Court should consider in determining whether to grant a motion to withdraw the reference.  They are often referred to as the "Orion Factors."

## ARGUMENT

### I.   THE UNIVERSAL CLAIMANTS HAVE MERITORIOUS INFRINGEMENT CLAIMS AGAINST FRONTIER

As detailed in the Universal Pre-Petition Claim and as a fully-developed evidentiary record will show, Frontier is contributorily and vicariously liable for the direct infringements of the Universal Claimants' copyrighted sound recordings by Frontier's subscribers.[8]

#### A.   Frontier's Subscribers Directly Infringed the Universal Claimants' Copyrighted Works

Downloading and distributing copyrighted music via online P2P networks constitute direct copyright infringement, violating the exclusive rights of reproduction and distribution, respectively. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 918–23 (2005) (noting that P2P networks facilitate a staggering quantity of infringement of copyrighted music); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 963–64 (E.D. Va. 2016) (same), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293, 307–12 (4th Cir. 2018).

Since 2013, representatives of the Copyright Claimants, including the Universal Claimants, have sent Frontier tens of thousands of copyright infringement notices, which fully complied with the DMCA, detailing specific instances of its subscribers accessing P2P services via Frontier's network to unlawfully distribute and copy copyrighted works ("DMCA Notices"). With respect to the Universal Pre-Petition Claim, the DMCA Notices and the evidence collected

---

[8] A proof of claim is *prima facie* evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion.  Fed. R. Bankr. P. 3001(f); *see Abboud v. Abboud (In re Abboud)*, 232 B.R. 793, 796 (Bankr. N.D. Okla. 1999), *aff'd*, 237 B.R. 777 (10th Cir. B.A.P. 1999); *In re Adelphia Communications Corp.*, No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007).  If the objector produces "evidence equal in force to the prima facie case . . . which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency," the burden then shifts to the claimant to establish its claim by a preponderance of the evidence.  *Allegheny Int'l, Inc. v. Snyder (In re Allegheny Int'l, Inc.)*, 954 F.2d 167, 173–174 (3d Cir. 1992) (citing *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

prior to sending each DMCA Notice will demonstrate that Frontier's subscribers used P2P file-sharing programs to reproduce and distribute—rather than merely make available—files that were confirmed to be copies of the Universal Claimants' copyrighted sound recordings.

Frontier argues that there is no reliable evidence of distribution because the evidence was collected by a third-party vendor retained by the Universal Claimants. (*See* Claim Objection at 8.) This argument is contrary to clear law. "Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work." *Arista Recs. LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) (citing *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 149–150 n. 16 (S.D.N.Y.2009) ("Defendants' argument that [downloads by Plaintiffs' investigators] are not proof of unauthorized copying because Plaintiffs had 'authorized' the downloads by their investigators is without merit. Courts routinely base findings of infringement on the actions of plaintiffs' investigators." (collecting cases))); *see also Warner Bros. Records Inc. v. Walker*, 704 F. Supp. 2d 460, 467 (W.D. Pa. 2010) (holding that downloads by investigator MediaSentry "establish[ed] unauthorized distribution as to those nine recordings"); *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1216 (D. Minn. 2008) ("[D]istribution to MediaSentry can form the basis of an infringement claim."); *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008) (holding that MediaSentry downloads could form the basis of infringement claim because "the recording companies obviously did not intend to license MediaSentry to authorize distribution or to reproduce copies of their works" and "the investigator's assignment was part of the recording companies' attempt to stop Howell's infringement, and therefore the 12 copies obtained by MediaSentry are unauthorized" (citing *Olan Mills, Inc. v. Linn Photo Co*., 23 F.3d 1345, 1348 (8th Cir. 1994))).

Further, as a protocol, BitTorrent prevents anyone from seeing any acts of distribution other than those in which they are engaged.  As such, if Frontier's argument were to succeed, nobody could ever be held responsible for acts of reproduction or distribution on BitTorrent.

Frontier's argument that Universal Claimants' evidence collection only shows active distribution at a single point in time and is therefore *de minimis* misses the point.  (*See* Claim Objection at 8.)  Frontier's subscribers were caught red-handed distributing infringing works on a repeated basis.  The infringement is anything but *de minimis*; it was repeated and substantial. The Universal Claimants are confident that discovery will establish direct infringement of the Universal Claimants' copyrighted works by Frontier's subscribers.

### B.      Frontier Is Liable for Contributory Copyright Infringement

Frontier's conduct renders it liable for contributory infringement.  A contributory infringer is one who, (1) "with knowledge of the infringing activity," (2) "induces, causes or materially contributes to the infringing conduct of another." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  The knowledge standard for contributory infringement "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it." *BMG*, 881 F.3d at 311–12 (emphasis in original).  Here, Frontier had actual knowledge of ongoing infringement by specific Frontier subscribers.

The infringement notices sent by the Universal Claimants included the information required by the DMCA.  The DMCA Notices included detailed information identifying the unique Internet Protocol ("IP") address assigned to each user of Frontier's network, the date and time the infringing activity was detected, the date the notice was sent, the name and hash value

of the infringing file,[9] and a list of sample works in the infringing file.  (*See* Universal Pre-Petition Proof of Claim, Ex. B.)  The DMCA Notices alerted Frontier to ongoing infringement by specific Frontier subscribers.  As such, Frontier absolutely could have done something about the infringement had it chosen to do so.  But, more importantly, the notion that a DMCA-compliant infringement notice is insufficient to imbue an ISP with knowledge is contrary to the entire purpose of DMCA notices.  Other courts that have considered virtually identical notices have deemed them to be sufficient to establish knowledge for purposes of contributory infringement.  *Sony Music Ent. v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d 217, 232–33 (E.D. Va. 2019).

Notably, Frontier does not dispute the DMCA Notices it received identified hundreds of infringing subscribers in multiple DMCA Notices on multiple days.  Frontier's receipt of those notices over a period of time provided Frontier with the requisite knowledge of repeat infringers.  Further, only Frontier, as the provider of the technology and the system used to infringe, is able to match the IP address identified in a given DMCA Notice to a particular subscriber, and to suspend or terminate that infringing subscriber's account.  Moreover, Frontier undoubtedly has complete records of all of the other infringement notices that it received from other content owners with respect to specific Frontier subscribers that were identified in the Universal Claimants' DMCA Notices.  Thus, Frontier had "specific enough knowledge of infringement that [Frontier] could *do* something about it."  *BMG*, 881 F.3d at 311–12 (emphasis in original).

Discovery will demonstrate that Frontier developed policies and procedures detailing how it would respond to infringement notices such that its response would have little to no impact on its subscribers' use of the Frontier network.  Discovery will also likely show that Frontier was well aware that its network was being used for infringement, and, because that

---

[9] A hash value is an alphanumerical, cryptographic representation of the contents of a file.  Files with the same hash value are identical and will have the same contents.

infringement used higher bandwidth than normal usage, Frontier was earning substantially more revenues with respect to those accounts on a monthly basis.

Discovery will also show—and Frontier does not dispute—that Frontier's provision of high-speed Internet services materially contributed to their subscribers' direct infringements.

C.   **Frontier Is Vicariously Liable for Copyright Infringement**

Frontier's conduct also renders it vicariously liable for copyright infringement because it "profit[ed] from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. "When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (citation omitted).

Discovery will show—and Frontier does not dispute—that the elements for vicarious liability are met. Frontier had a contractual and actual ability to stop or limit the ongoing infringement by suspending or terminating an account. Further, by failing to terminate the accounts of specific, repeat infringers known to Frontier, Frontier obtained a direct financial benefit from that infringing activity. That financial benefit included revenue that Frontier would not have otherwise received had it taken action against those accounts. Frontier refused to suspend or terminate repeat infringers for one simple reason: it did not want to lose the revenue stream generated from infringers who paid more money for plans with faster Internet speeds and greater data usage.

Discovery will disclose the revenues that Frontier received specifically related to the infringing subscribers.

### D.       Frontier Cannot Establish Its Eligibility for a DMCA Safe Harbor

The DMCA provides several safe harbors that limit the copyright infringement liability of an ISP.  Frontier seeks the benefit of the safe harbor provided by 17 U.S.C. § 512(i)(1)(A).  To fall within that safe harbor, Frontier bears the burden of demonstrating that it has "adopted and reasonably implemented, and informs subscribers . . .  of, a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers."  *Id.*

Discovery will show that Frontier has no repeat infringer policy that would bring Frontier under a DMCA safe harbor and that the policies that Frontier did have in place were not intended to address repeat infringers.  The only policy that Frontier identifies in the Claim Objection is its Residential Internet Acceptable Use Policy, which provides that "[r]epeated copyright infringements are grounds for termination of service."  (Claim Objection ¶¶ 26–29; Universal Pre-Petition Proof of Claim, Ex. C, at 1.)  But that Acceptable Use Policy is not a repeat infringer policy; it is merely a reservation of rights.  It does not specify the "appropriate circumstances" under which Frontier actually would terminate the services of a repeat infringer.  The Universal Claimants are not aware of—nor has Frontier identified or produced—any other policy pertaining to repeat infringers that Frontier has communicated to subscribers or the public.

Moreover, to be eligible for the safe harbor under § 512(i)(1)(A), an ISP must "reasonably implement[]" a termination policy, not just adopt one.  To the extent Frontier had a repeat infringer policy, discovery will show that Frontier failed to implement its policy in a reasonable way.  The Universal Claimants identified to Frontier many Frontier subscribers who were the subject of dozens, or even hundreds, of DMCA Notices, who were never terminated. While Frontier has indicated that it has terminated subscribers in appropriate circumstances, this abstract claim has little weight for three reasons:  (1) the number of terminations was *de minimis*, (2) the terminations were not done pursuant to a repeat infringer policy, and (3) Frontier failed to

terminate subscribers who were the subject of hundreds of notices.  Any policy that allows for a subscriber to be subject to even a hundred DMCA notices before that subscriber can be considered for termination—much less actually terminated— is not a policy at all, let alone a reasonably implemented and effective policy.

Discovery will show that Frontier cannot qualify for a DMCA safe harbor.

### E.    Frontier's Infringement of the Universal Claimants' Copyrighted Works Was Willful

Frontier's infringement acts were willful, intentional, and purposeful, in disregard of the Universal Claimants' copyrights.  Frontier failed to adequately respond to the Universal Claimants' DMCA Notices.  It deliberately refused to take reasonable measures to curb its subscribers from using its service to infringe on the copyrights of others, including the Universal Claimants, despite Frontier's direct knowledge of *particular subscribers* engaging in *specific, repeated acts* of infringement.

### F.    The Universal Claimants Are Entitled to Relief for Frontier's Infringement

The Universal Claimants seek the following relief: (a) statutory damages based upon Frontier's willful acts of infringement of their copyrighted sound recordings and unauthorized acts, as alleged above, pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq*.; (b) the costs and disbursements of an action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505; and (c) such other and further relief as a court deems just and proper.

As a direct and proximate result of Frontier's willful infringement of the Universal Claimants' copyrights, the Universal Claimants are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount between $750 and $150,000 for each of the 1,652 works infringed, or such other amount as may be proper under 17 U.S.C. § 504(c).  The number of

works infringed will be adjusted, as necessary, after the Universal Claimants are given access to Frontier's relevant books and records.

The availability of statutory damages is *not* contingent on the demonstration of actual damages, including lost revenue, illicit profits or any other particularized measure of harm. *See* 17 U.S.C. § 504(c)(1). A key function of statutory damages is to address situations where "no actual damages are proven or they are difficult to calculate." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989). Indeed, statutory damages are available even for "uninjurious and unprofitable invasions of copyright." *F. W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).

Moreover, the amount of an appropriate statutory damages award is ordinarily subject to a jury determination, and not Frontier's say-so. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998). A jury, properly instructed on the appropriate factors to consider, should consider the complete record and determine the appropriate statutory damages amount to which the Universal Claimants are entitled. *See Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 503–04 (1st Cir. 2011).

## II.   FRONTIER'S PROPOSED ADJUDICATION SCHEDULE IS ARBITRARY AND UNREASONABLE

The adjudication schedule proposed by Frontier fails to account for the complex federal copyright issues raised by the Universal Pre-Petition Claim, the substantial fact discovery and extensive use of expert witnesses required to litigate complex copyrights matters, and the coordination of a number of substantially similar pre-petition, administrative, and post-Effective Date claims.

**A.      The Universal Pre-Petition Claim Involves Complex Copyright Issues That Cannot Be Resolved Within Frontier's Proposed Schedule**

The Universal Pre-Petition Claim involves complex issues of non-bankruptcy law arising under the Copyright Act and the DMCA, 17 U.S.C. §§ 101 *et seq.*  Frontier asserts that it is insulated from liability by a safe-harbor provision in the DMCA that Frontier contends protects it for the "passive" transmission of content by its customers.  The application of that affirmative defense is a critical and difficult issue that will require more than the six months that Frontier has proposed for discovery and adjudication.

**B.      Adjudication of the Universal Pre-Petition Claim Will Require Extensive Discovery**

The Universal Pre-Petition Claim is based on complicated and nuanced applications of copyright law that will require extensive factual and expert discovery.  The notion that the claim could be dispensed with in a matter of a few months is both impracticable, given the complexity of the factual and legal issues that must be adjudicated to determine liability and damages, and highly prejudicial.  Typically, in cases such as this, there will be both fact and expert discovery, which can take between nine months to two years depending on the scope of the claims.  These time frames are based on the litigation of analogous cases against Cox Communications in the United States District Court for the Eastern District of Virginia and Charter Communications in the United States District Court for the District of Colorado.

To establish their claim, the Universal Claimants will seek from Frontier, among other things, detailed discovery into the entirety of its data on DMCA Notices it received and its responses (if any) to those notices over a three-year period, as well as Frontier's internal communications relating to those notices.  In support of the Universal Claimants' claim that Frontier has directly profited through revenues realized from its refusal to suspend or terminate known infringers, the Universal Claimants will seek extensive billing data relating to subscribers

who were the subject of multiple notices.  This discovery, among others, will be data intensive and will likely take several months, at a minimum, to gather and analyze.

For fact discovery, the Universal Claimants will seek discovery, *inter alia,* into Frontier's policies relating to copyright infringement, including how Frontier developed and changed those policies.  Also at issue will be how Frontier implemented those policies and what Frontier did in response to hundreds of thousands of infringement notices it received from copyright owners concerning rampant infringement on its network.  This discovery will include information from Frontier's call center records relating to interactions with subscribers who were the subject of infringement notices.  The discovery will include Frontier's own studies or analyses concerning repeat infringement by its subscribers, the use of piracy protocols (such as BitTorrent) on its platform, and the suspension or termination of Internet services for copyright infringement. Plaintiffs will seek discovery into how Frontier addressed other subscriber violations of its policies not relating to copyright infringement.  If past experience from litigating similar cases against other ISPs in other jurisdictions is any guide, there will be regular motion practice on discovery issues.

With respect to expert discovery, the parties may rely on several different expert witnesses, including: (1) a technical expert to analyze and explain the peer-to-peer infringement at issue and Frontier's system to respond to that infringement; (2) a data analyst to compile and analyze data relating to Frontier's responses to infringement notices; and (3) a financial expert to analyze both Frontier's revenues from provision of services to known infringers and Frontier's overall financial position.

C.      **The Adjudication Schedule Proposed by the Debtors Is Unrealistic and Designed to Thwart the Universal Claimants' Claims**

There is no rational basis for a six-month adjudication schedule.  While the timeline may be appropriate for a garden-variety claim, that is not the case here.  The Universal Pre-Petition Claim involves complex copyright issues.

Frontier's failure to carry out limited, informal discovery over a two-month period demonstrates why the proposed adjudication schedule is not feasible.  As discussed above, Frontier agreed to provide informal discovery limited to the single issue of its eligibility for a DMCA safe harbor and failed to provide many of the documents it had agreed to produce and within the schedule to which it had agreed.  The Universal Claimants' requests sought the following information for a three-year period: (1) Frontier's copyright infringement-related policies, including any repeat infringer policy and documents describing the implementation of the policies; (2) summary numbers showing the number of infringement notices that Frontier has received and the number of suspensions, terminations, or other actions taken in response to those notices; and (3) a log of infringement notices received by Frontier.  To date—and certainly not by May 17, 2021, as Frontier proposed in its schedule—Frontier has yet to produce, for the entire time period at issue, its repeat infringer policies, summary numbers of infringement notices received and actions taken in response, and notice data.  While Frontier has produced some notice data and summary numbers it selectively chose, Frontier has provided no explanation for the substantial gaps in its production.

Further, Frontier's proposed schedule imposes limitations on discovery devices that are arbitrary, unreasonable, and premature.  For example, the proposed schedule requires the Universal Claimants to produce all "evidence" (essentially all discovery) within one week of the hearing without having received a single document request.  Moreover, Frontier offers no basis

to limiting the number of requests for admission, requests for production of documents, and Rule 30(b)(6) deposition topics to five each.  Nor does Frontier provide any explanation for entirely eliminating the use of interrogatories.

As discussed above, the proposed schedule fails to allow sufficient time to address discovery disputes that are common in complex copyright cases, such as this, and that are likely to arise here.  For instance, despite the fact that the Bankruptcy Court has already entered a Stipulated Protective Order, Frontier raises confidentiality and privacy concerns that need to be addressed and have stymied informal discovery.

The trial schedule is also unworkable and unnecessary.  First, Frontier has proposed that an evidentiary hearing commence only ten days after the completion of discovery, without providing time for the filing of dispositive motions.  Regardless, the proposed ten-day period is unreasonably short, as the evidentiary hearing will require, among other things, significant witness preparation, a pre-trial order, deposition transcript designations, and declarations for direct testimony.  Such preparations would ordinarily take weeks.  In addition, Frontier's 15-page limitation for pretrial briefs on complex copyright issues is arbitrary and premature.  Frontier's Claim Objection runs 18 pages and does not address any of the issues in detail.  Similarly, the four days Frontier allotted for the evidentiary hearing is insufficient and premature.

Finally, there is no reason for an evidentiary hearing must be held in six months.  The Bankruptcy Court has confirmed the Plan and the Debtors have emerged from bankruptcy.  Extending the schedule by several months will not interfere with the administration of the bankruptcy estate or payouts to other creditors; this is a 100% case.

**D.    The Legal and Factual Issues Raised in the Pre-Petition, Post-Petition, and Post-Effective Date Claims Are Identical and Discovery Should Be Coordinated**

The legal and factual issues raised in the pre-petition, post-petition, and post-Effective Date claims are substantially identical, and discovery and adjudication should be coordinated.[10] Adjudicating the Proofs of Claim in the Bankruptcy Court and separately adjudicating the District Court Action in the District Court will result in massive duplication and runs the risk of conflicting results.  Uncoordinated proceedings will result in the parties propounding, receiving, and responding to multiple sets of nearly identical discovery requests, increasing everyone's costs and the risk of conflicting discovery decisions.  While certainly more efficient, coordinated proceedings further underscores the need for any discovery schedule to allow for the District Court to decide the Copyright Claimants' Withdrawal Motion and for additional time for the completion of discovery.

## RESERVATION OF RIGHTS

The Universal Claimants expressly reserve all rights that they may now or at any time hereafter may have against Frontier, or any other entity or person, and any property held by Frontier or any such entity or person.  This Response is not intended to be, and shall not be construed as: (1) an election of remedies; (2) a waiver of any defaults; (3) a waiver or limitation on any rights, remedies, claims, or interests of the Universal Claimants; (4) a waiver of the right to move to withdraw the reference; or (5) a waiver of the right to a jury trial.

The Universal Claimants reserve any and all rights with respect to the Universal Pre-Petition Claim and Administrative Claims (and any other claims they may file in this bankruptcy

---

[10] While Frontier's objection is only with respect to pre-petition claims, the Plan provides that all proofs of claim are considered objected to unless explicitly allowed.  *See* Plan Art. VII.A.  Undoubtedly, the Debtors will also file an objection to the Administrative Claims, which will require discovery from the Sony and Warner Claimants.

case), including, but not limited to, the right to: (a) amend, update, or supplement the Universal Pre-Petition Claim and Administrative Claims at any time and in any respect; (b) file additional administrative claims or proofs of claim; (c) file requests for payment of administrative or priority expenses in accordance with 11 U.S.C. §§ 503 and 507; (d) file a motion to withdraw the reference; (e) object to the Bankruptcy Court's entry of a final order or judgment on jurisdictional grounds; (f) demand a jury trial; (g) commence an action in another forum pursuant to 28 U.S.C. § 959; (h) move to stay discovery; and (i) commence an action in another forum based on infringement of their copyrighted works occurring on dates not covered by the Universal Pre-Petition Claim and Administrative Claims.

By filing this Response, the Universal Claimants do not submit to the jurisdiction of the Bankruptcy Court for any purpose other than to comply with the Bankruptcy Court's procedures for adjudicating disputes, and the Universal Claimants do not waive, and specifically preserve, all of their procedural, substantive, jurisdictional, and Constitutional defenses to any claim that may be asserted against the Universal Claimants by Frontier or by any trustee of its estate, including any defense based upon the lack of jurisdiction of this Bankruptcy Court to entertain any such claim.  The Universal Claimants specifically preserve their Constitutional right to a jury trial.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should overrule the Debtors' objection and grant

such further relief as the Court deems just and proper.

Dated:  White Plains, New York
   June 9, 2021

         LUSKIN, STERN & EISLER LLP


         By:   /s/ Michael Luskin
            Michael Luskin
            Stephan E. Hornung

         50 Main Street
         White Plains, New York 10606
         (212) 597-8200

         - and -

         OPPENHEIM + ZEBRAK, LLP
         Matthew J. Oppenheim
         Lucy Grace D. Noyola (*pro hac vice motion forthcoming*)
         4350 Wisconsin Avenue, NW, Fifth Floor
         Washington, DC 20016
         (202) 480-2999